IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | 16-mj-960/16-mj-1061 |
| | : | |
| v. | : | Philadelphia, Pennsylvania |
| | : | April 18, 2017 |
| IN RE: | : | |
| | : | |
| SEARCH WARRANT | : | |
| WITH GOOGLE ACCOUNTS | : | |
| | : | ORAL ARGUMENTS HEARING |

- - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE THE HONORABLE JUAN R. SANCHEZ
UNITED STATES DISTRICT JUDGE

APPEARANCES:

Government:            ANDREW S. PAK, ESQUIRE
                       UNITED STATES DEPARTMENT OF JUSTICE
                       CRIMINAL DIVISION
                       1301 New York Avenue, N.W.
                       Washington, D.C.  20005

                       JAMES A. PETKUN, ESQUIRE
                       MICHAEL L. LEVY, ESQUIRE
                       UNITED STATES ATTORNEY'S OFFICE
                       615 Chestnut Street, Suite 1250
                       Philadelphia, Pennsylvania  19106

Defendants:            TODD M. HINNEN, ESQUIRE
                       PERKINS COIE
                       1201 Third Avenue, Suite 4900
                       Seattle, Washington  98101

                       WILLIAM A. DeSTEFANO, ESQUIRE
                       STEVENS & LEE
                       1818 Market Street, 29th Floor
                       Philadelphia, Pennsylvania  19103

ESR Operator:          Patrick Kelly

TRANSCRIBED BY:        Drummond Transcription Service
                       Haddon Heights, New Jersey  08035

Proceedings recorded by electronic sound recording,
transcript produced by computer-aided transcription
service.

1          (At 10:02 a.m. in Courtroom 11A.)

2          DEPUTY CLERK:  All rise.

3          THE COURT:  You may be seated.  Good morning,

4    everyone.

5          This is the matter of <u>Google versus the United States</u>.

6    The Court recognizes Attorney Todd Hinnen.

7          MR. HINNEN:  Yes, your Honor.

8          THE COURT:  And the Court also recognizes Attorney

9    William DeStefano.

10         MR. DeSTEFANO:  Good morning, your Honor.

11         THE COURT:  Good morning.

12         The Court also recognizes counsel for the Government,

13   Attorney Pak.

14         MR. PAK:  Good morning, your Honor, thank you.

15         THE COURT:  Good morning.

16         Attorney Levy.

17         MR. LEVY:  Good morning, your Honor.

18         THE COURT:  And Attorney Pekun.

19         MR. PEKUN:  Good morning, your Honor.

20         THE COURT:  All right, good morning, everyone.

21         I gather that you are ready to start the arguments?

22         MR. HINNEN:  Yes --

23         DeSTEFANO:  We are, your Honor.

24         MR. HINNEN:  -- we are, your Honor.

25         THE COURT:  Okay.  Very well.

1          So, this will be -- is the plaintiff ready?

2          MR. PAK:  Yes, your Honor.

3          THE COURT:  Okay.

4          MR. HINNEN:  May I speak from the podium, your Honor?

5          THE COURT:  You may.  Why don't you just come a little

6     closer.

7          MR. HINNEN:  Thank you.

8          THE COURT:  And it might be helpful for you to answer

9     a couple of factual questions for me, so that I could understand

10    the context -- a little bit -- of the argument, based on the

11    stipulations or the one stipulation that both you and the

12    Government presented to the Court and it was filed of record on

13    January 12th, 2017.

14         And that is that the stipulation says, basically, that

15    users' files may be broken down into component parts with

16    different parts of a single file stored in different locations

17    at different countries at the same time?

18         MR. HINNEN:  That's correct, your Honor.

19         THE COURT:  My question is, does that mean that a

20    single e-mail may be broken down in to pieces that are stored in

21    different locations at the same time?

22         MR. HINNEN:  So, it's difficult to answer any general

23    question with respect to Google Services, because it has a

24    diversity of different services.

25         And with respect to the bodies of e-mails, I believe,

1  those are stored as a -- as a single hold, but your Honor's

2  point does apply to attachments to e-mails.

3       So, if I were to attach a Word document to an e-mail

4  to your Honor, it's possible that the network would break that

5  single Word document up in to multiple different component parts

6  which Google refers to as shards and store those parts at

7  different places on its network.

8       And the document would only be a comprehensible hold

9  when all of those different shards were reassembled to form the

10 whole document.

11      THE COURT:  So -- so, what I was trying to get at is,

12 as to whether if you were to copy the data for a particular

13 customer from a particular location at a given point in time,

14 would you be able to get a complete e-mail or would you just get

15 fragmental parts that are meaningless, unless you put the -- the

16 pieces together that are located or spread around in different

17 countries at different points of time?

18      MR. HINNEN:  And with respect to some of Googles's

19 services, your Honor, the latter is true.  You would only be

20 able to produce the document, if you pulled each part from each

21 different data center wherever in the world it happened to be

22 located.

23      THE COURT:  All right.

24      So, it only makes sense when all of the pieces are

25 kind of reassembled --

1          MR. HINNEN:  That's correct.

2          THE COURT:  -- and you are able to get them in a -- in

3  a readable format --

4          MR. HINNEN:  That's correct, your Honor.

5          THE COURT:  -- that's when it has meaning?

6          MR. HINNEN:  That's correct, that's exactly right.

7          THE COURT:  So, if you were to get these pieces from

8  overseas and look at them, they would be meaningless?

9          MR. HINNEN:  That's exactly right, your Honor.

10         And they're not like pieces of a puzzle, where if you

11  got six of the seven pieces, you could make out six-sevenths of

12  the document.  You can't make out anything comprehensible unless

13  you have all seven.

14         I -- I should hasten to add, though, that that does

15  only apply to some of Google services and the majority of the

16  services at issue in this case, sharding was not applied and the

17  documents were stored in the United States.

18         So, Google has been able to produce a significant

19  volume of documents in this case, both as a -- sort of general

20  matter -- and relevant to the -- to the whole corpus of

21  documents that would be encompassed by the warrants, if they

22  were to apply overseas as well as in the United States.

23         THE COURT:  All right.

24         (Whispering held off the record at 10:06 a.m.)

25         THE COURT:  The other factual question I have

1   regarding the stipulation is that, according to the stipulation,

2   only people in Google's legal investigation support team have

3   authorized access to access the contents of the communication in

4   order to respond to subpoenas, to court orders or to properly-

5   issued warrants.

6        My question is, how do these personnel -- people --

7   from the Legal Department assemble the data -- how do they go

8   about assembling this data?  What is it that they exactly do in

9   copying or producing or retrieving the data?

10       MR. HINNEN:  That's a -- a great question, your Honor

11  and I'll address it, briefly, in -- in the course of my

12  argument.

13       In order to query the network to ask the network

14  questions about where documents are, to isolate the responsive

15  documents and to retrieve the documents, so that they can be

16  produced, Google would have to write a query or a -- or a small

17  computer program for each of its services in order to go out,

18  search its network, determine where the documents are located,

19  gather only those documents that are responsive, nominally, to

20  the scope of the search warrant and retrieve those documents to

21  the United States, so they could be produced.

22       So, the process involves a series of queries from

23  Google's headquarters in California to wherever the documents

24  are located and responses from the data centers in those

25  locations to the United States, including ultimately sending the

1  documents that are responsive, so that they can be produced.

2  THE COURT:  So, one question I have is, do the people

3  who retrieve the data in response to the warrant, do they know

4  -- at the point in time that they write the query or the program

5  -- do they know where the data is coming from?

6  MR. HINNEN:  They didn't, your Honor, when the Second

7  Circuit handed down its decision last July.

8  And in order to be able to comply with the Second

9  Circuit's decision in the Microsoft case, Google has had to

10  rewrite those programs, so that they would tell the individual

11  who is responsible for producing the documents, at least,

12  whether the documents are inside or outside the United States.

13  So, at this point, when the query is run, the query

14  is, actually, limited to data centers within the United States.

15  THE COURT:  Okay.

16  But so, they limit it, they don't -- they cannot tell

17  -- they -- by writing the program in such a way, they impose a

18  limitation as to what they believe is responsive to the

19  Government wants, excluding --

20  MR. HINNEN:  They do, they --

21  THE COURT:  -- excluding overseas data?

22  MR. HINNEN:  That's correct, your Honor.

23  They ask questions of and receive answers from only

24  data centers located in the United States.

25  THE COURT:  But obviously, you would have the same

1   ability to write a query or a program as you -- as you say --

2   that will be able to identify not only what is data that is --

3   is within the territory of the United States but also

4   overseas --

5           MR. HINNEN:  Yes, your Honor, that -- that would --

6           THE COURT:  -- that's not a problem, right?

7           MR. HINNEN:  -- would be possible as a matter of

8   computer programming.

9           THE COURT:  Right.

10          MR. HINNEN:  Correct.

11          THE COURT:  As a matter of computer programming, those

12  people that are writing the program and -- and retrieving or

13  reassembling -- for lack of a better word -- the data, that is

14  either coming from the United States or coming from abroad, how

15  long is that process?

16          MR. HINNEN:  It's relatively involved, your Honor,

17  because Google offers so many different services and its network

18  is so complex.  The process of -- of rewriting the set of

19  queries necessary to produce Govern -- information to the

20  Government -- took from when Google initiated it shortly after

21  the decision was handed down last July and it's still not

22  complete with respect to all services.

23          So, it's a very significant computer programming or

24  engineering exercise to write a query that reliably, identifies

25  the location of the data, limits itself to data in the United

1  States, isolates data responsive to the warrant and returns it

2  to the individual.

3          THE COURT:  But that is because you had to write it

4  for the first time --

5          MR. HINNEN:  That's correct, your Honor.

6          THE COURT:  -- once you'd write it once, it's easy to

7  repeat?

8          MR. HINNEN:  That's correct, your Honor.

9          THE COURT:  Once you have it in your hands, how

10  quickly is it to identify the data that is responsive to the

11  warrant?

12          MR. HINNEN:  It depends a little bit on how many

13  services the warrant relates to and that kind of thing, because

14  these processes do have to be run separately for separate

15  services.  But I would say, the average compliance time is -- is

16  a couple of weeks to a month.

17          THE COURT:  Okay, okay.  Fair enough.

18          Let me move on to, probably, one of the -- to get the

19  argument started and focus a little bit.

20          You argue that for purposes of the second step of the

21  analysis under Morrison or under the Supreme Court case law, the

22  focus of the Stored Communication Act is the protection of the

23  privacy of the electronic communications.

24          And so, my question is, is it the focus of the Stored

25  Communications Act as a whole, that is relevant or the focus of

1    the -- that particular section, which talks about disclosure,

2    2703?

3            MR. HINNEN:  Sure.  That's a great question, your

4    Honor.

5            Ultimately, I -- I don't think it matters.  I think

6    there has been some confusion introduced through the briefing

7    between determining whether a provision applies

8    extraterritorially and determining what the focus of the statute

9    is.

10           The determination of whether a provision applies

11   extraterritorially takes place on a section-by-section basis as

12   Morrison made clear with respect to the Securities and Exchange

13   Act in Morrison.

14           But that doesn't constrain a court in interpreting and

15   understanding the statute from looking at the totality of the

16   statute as common and well-established canons of statutory

17   interpretation would require it to do.  Morrison, itself, looked

18   at the -- at the prologue to the statute, it even looked at a

19   separate but related statute in interpreting the statute to

20   determine what the focus was.

21           And at the end of the day, your Honor, I -- Google

22   doesn't think it matters that we need to fedachize (ph) a

23   particular word as the focus of the statute, it's pretty clear

24   that 2703 focuses on balancing law-enforcement equities with

25   individual privacy --

1    THE COURT:  Well --

2    MR. HINNEN:  -- and that as a result of that, it uses

3  different kinds of process with different procedures and

4  different safeguards to obtain -- to all the Government -- to

5  obtain different kinds of user communications.  And the question

6  at the end of the day will be, what conduct is relevant to that

7  balance or to that.

8    THE COURT:  There's -- I guess -- I guess, as you well

9  know, Judge Rueter basically, found that -- you know -- the

10  relevant conduct here is what happened in the United States,

11  where the -- where the data was produced.

12    MR. HINNEN:  Correct.

13    THE COURT:  And, you know, so the question is, if it

14  doesn't matter to you, isn't it the relevant conduct for

15  purposes of 2703, compel disclosure of the fact that you have a

16  U.S. target of an investigation, you have -- that target -- who

17  created the data -- created the data -- in the United States

18  presumably, right?

19    You have the United States, who has properly obtained

20  a warrant-- a warrant -- for these two investigations in the

21  United States.  And then, you have no matter where the

22  information is in the world, basically, I think, everybody

23  agrees that the people who have to retrieve the data are within

24  the United States -- at a computer someplace in the United

25  States -- who will be reassembling the data.

1    So -- so, the -- the point being which he reached is

2    that this is a domestic obligation of the search-warrant

3    requirement under the statute.

4         MR. HINNEN:  Yes, your Honor and --

5         THE COURT:  So, why -- why are you saying that, this

6    is an extraterritorial obligation of the statute when all of the

7    activity is -- is happening in the United States, the only thing

8    that happens is that Google -- for their own business reasons --

9    kind of took the information and stored it someplace else,

10   because it may be promoting the interests of performance,

11   reliability and, I guess, costs, it may be cheaper to -- to

12   store it someplace else.

13        MR. HINNEN:  So, there is a lot packed in to the

14   question, your Honor, let -- let me see if I can kind of unpack

15   it, piece by piece.

16        First with respect to Magistrate Judge Rueter's

17   analysis, that's actually where he erred, when he got to the

18   question that the Morrison test requires a court to ask in Step

19   2, where does the conduct relevant to the focus of the statute

20   occur, he limited his analysis to where does a constitutional

21   search or seizure occur.

22        And if you'd look at his opinion, he cites several

23   cases that talk about where a Fourth Amendment decision occurs.

24   He ends up, actually, looking at -- you know -- when an officer

25   conducting a physical search of a house can look at the serial

1    number of a turntable to try and determine whether -- whether a

2    search occurs outside the United States as part of the Morrison

3    analysis.  The Morrison analysis is expressly not a

4    constitutional analysis, it's a statutory analysis.

5            And where he went off the rails, if you will, your

6    Honor, is where he limited his query to:

7            Well, where does a constitutional search or

8        seizure exist?

9            What Morrison requires is a court to determine whether

10   any conduct relevant to the focus of the statute occurs outside

11   the United States and --

12           THE COURT:  So, you mean -- so, what is the critical

13   conduct --

14           MR. HINNEN:  That occurs outside of the United --

15           THE COURT:  -- that occurs outside the United States,

16   that you think makes the Government's life impossible to getting

17   this information?

18           MR. HINNEN:  It's -- it's the parts -- the essential

19   parts of executing the warrant issued under the Stored

20   Communications Act, that have to occur outside the United States

21   with respect to data stored outside the United States.  So, it's

22   Google accessing a data center that's located out --

23           THE COURT:  But you will agree with me, that access

24   -- Google has access -- authorized access -- under the statute,

25   they have access?

1          MR. HINNEN:  Yes, your Honor.

2          THE COURT:  They could access the information at any

3    point in time, anywhere in -- any conditions they have for the

4    -- and -- so, you agree with that?

5          MR. HINNEN:  They could, yes, your Honor.

6          THE COURT:  And access means just the fact that they

7    may have the ability to locate where the information is?

8          MR. HINNEN:  Yes, your Honor.

9          THE COURT:  All right.

10         And the statute based upon probable cause authorizes

11   the Government with a warrant to get the information, right?

12         MR. HINNEN:  Well, I think, we're here, your Honor, to

13   determine what information the warrant authorizes the Government

14   to get.

15         THE COURT:  But -- but the information -- the

16   information -- if I understood correctly, your previous answer

17   to my question, the information is gathered -- is spread -- it's

18   spread or gathered throughout the world in non-readable -- non-

19   readable formats, so, it's meaningless to anybody else, who is

20   going to go out to wherever it is to get it, right?

21         MR. HINNEN:  Some of it is, your Honor, yes.  Some of

22   it is stored in a different format and it would be meaningful in

23   its native stored format.

24         THE COURT:  So, if -- if -- this is what I'm getting

25   at, I think that if, for example, I agree with you, that this is

1  an extraterritorial application of the Stored Communications

2  Act, the Government would never be able to get this

3  information --

4          MR. HINNEN:  That's --

5          THE COURT:  -- right?

6          MR. HINNEN:  -- that's possible with respect to some

7  of it, your Honor.

8          THE COURT:  And your argument is well, then, go to

9  Congress and have Congress kind of deal with the issue, right?

10         MR. HINNEN:  Yes, essentially, our argument is, it's a

11 statute that was written in 1986, when there was no global

12 Internet and there was no set of global communications network,

13 it doesn't apply appropriately to modern technology that

14 Congress should amend the statute and make sure that it does.

15         THE COURT:  There is something that has been bugging

16 me for a little while and maybe, you have the answer, maybe, you

17 don't.

18         It's why the sudden change, why in -- in 2017 -- the

19 Internet service providers are taking the position, that they're

20 not going to produce any information that is outside -- out of

21 the jurisdiction of the United States overseas, when you have

22 been producing this for decades, even though the technology has

23 been changing rapidly?

24         MR. HINNEN:  Yeah, I -- I think it's the -- the --

25 Microsoft, in a word, your Honor.

1    A circuit court of the United States caused everyone

2    to scrutinize this question with a degree of care, that -- that

3    they hadn't, perhaps, scrutinized it before.  And that caused a

4    searching inquiry in to the meaning of the statute and its

5    application to modern technology.

6        And the result of that for many -- many --

7    communication service providers, not all of them, because

8    different providers have different network architectures and

9    store their data in -- in different ways, but for many of them,

10   the answer to that question was, gosh, this statute that was

11   written thirty-one years ago, when the Internet was a U.S.-only

12   endeavor -- well, the Internet wasn't even born yet -- but even

13   -- even predecessor services like, e-mail were publicly-

14   available only in the United States, it just doesn't work any

15   more with respect to modern communications networks.

16        THE COURT:  Quickly on -- on the Microsoft opinion, is

17   -- it certainly is not binding upon me?

18        MR. HINNEN:  That's correct, your Honor, it's an out

19   of circuit precedent.

20        THE COURT:  And the question I have is, I know, I read

21   the opinion and I know there was three people, who felt that

22   they -- to have argument -- because they have strong opinions

23   about whether or not, the majority was right.  In fact, they

24   believe, the majority was wrong, because they believe that --

25   they took the position -- that all of the data indicates -- the

1    opinion indicates -- that this was a domestic application of the

2    Stored Communications Act, why are they wrong?

3              MR. HINNEN:  Well, I was -- I'm sorry --

4              THE COURT:  Why -- why are the -- why is the dissent

5    wrong, I mean, those were vigorously dissenting opinions --

6              MR. HINNEN:  Yeah.

7              THE COURT:  -- on the merits, although -- although

8    they were taking the position, that this is a request for an *en*

9    *banc* argument and it was a split, so it was -- it was highly --

10   this issue was highly contested --

11             MR. HINNEN:  Absolutely, your Honor.

12             THE COURT:  -- in the Second Circuit.

13             And one of the people, who wrote a concurring opinion,

14   articulated reasons why this is an important issue and a "C"

15   change in the *jurisprudence* in terms of seeking warrants --

16   seeking the ability of preventing the Government from conducting

17   legitimate investigations of American citizens, who are

18   committing some serious crimes.

19             MR. HINNEN:  Sure.

20             The reason, your -- they're wrong, your Honor, I

21   think, is the substance of our briefing and our argument, they

22   just simply misapply the second factor of the -- of the Morrison

23   test.

24             And I think failed to comprehend the significance of

25   Congress's requirement that with respect to communications

1  content, the Government must obtain a warrant with all of the

2  procedures and safeguards that that implies.

3  And so, that's why I think, they're wrong and I'll

4  speak to that at -- in much -- not much greater, but somewhat

5  greater lengths than --

6  THE COURT:  Right.

7  MR. HINNEN:  -- in my argument.

8  THE COURT:  So, at that point -- at that point, as you

9  well know, assuming the focus of the Stored Communications Act

10  and/or Section 23 -- 2703 is privacy as Judge Rueter asked you,

11  I think, in the argument and I'll ask you again here is:

12  Is where does the interference with the customers

13  privacy occurred, when the electronic communications are

14  disclosed to the Government or at some point else -- or some

15  point else in time, when we --

16  MR. HINNEN:  Sure.

17  THE COURT:  -- know what they're going to get is

18  gibberish?

19  MR. HINNEN:  So, I don't -- I don't think, it's an

20  either/or question, necessarily, your Honor, I think that the

21  issuance of a warrant initiates a process of interference with

22  the individual's privacy interest in their communications.

23  THE COURT:  But -- but the warrant protects that --

24  MR. HINNEN:  The warrant does protect that --

25  THE COURT:  -- is issuing of the warrant protects --

1       MR. HINNEN:  -- the warrant does protect that --

2       THE COURT:  -- it's a balancing act.

3       MR. HINNEN:  -- and I don't want to go down the Fourth

4   Amendment rabbit hole --

5       THE COURT:  Yeah, right.

6       MR. HINNEN:  -- that Judge Rueter did.

7       The question is, what is the conduct that's relevant

8   to that process and it involves the issuance of the warrant, the

9   service of the warrant on the provider and then, the provider's

10  execution of the warrant by searching its relevant data centers,

11  isolating responsive date, compiling that responsive data and

12  returning that responsive date to the United States.

13      And all of those four steps that are an essential part

14  the process, the Government does not get the communications

15  unless they occur, occur outside of the United States with

16  respect to data that's stored outside of the United States.

17      And I think, if you -- I think, you asked a user of

18  Google services or that kind of thing, if you said to a user,

19  you know, User, we've -- we've searched all of our data centers

20  around the world, we've gathered together your data and we've

21  brought it back to the United States under the compulsion of a

22  warrant and we haven't yet disclosed it, do you have any

23  interest that's been impacted by that?  Do you feel like your

24  privacy has been affected at all by the fact that we've searched

25  our networks all over the world under the compulsion of a

1    Government warrant --

2            THE COURT:  But you said -- you said -- that -- this

3    is an issue -- and something that, perhaps, you could help me

4    understand a little.

5            You -- Google -- for their own business reasons,

6    right --

7            MR. HINNEN:  Correct.

8            THE COURT:  -- for their own business reasons, took

9    that information of a customer and spread it around the world,

10   right, you didn't have to do that, I assume you could have kept

11   it in the United States, but you spread it around the world for

12   business reasons.

13           MR. HINNEN:  Correct.

14           THE COURT:  Some of these customers don't even know

15   that you've spread it around the world.  You did not interfere

16   with their use of the information, right, because they would

17   have access to all the data?

18           MR. HINNEN:  That's correct.

19           THE COURT:  And -- and -- and Google's access -- right

20   of access and right to the information is not interfered in any

21   shape -- or way of form, right?

22           MR. HINNEN:  Except for the fact, that Google is

23   compelled to undertake these steps in -- in compliance with the

24   warrant, but yes --

25           THE COURT:  Yes.

1       MR. HINNEN:  -- the way its services work and are

2  provided to the customer are not affected by -- by the

3  compliance that it engages in to comply with the warrant.

4       THE COURT:  So, where is the interference with the

5  right of privacy, isn't it at the point in time, where you kind

6  of duplicate the information and give it to the Government and

7  -- and the Government now -- because they didn't interfere with

8  your right of access, they didn't interfere with your right to

9  possess the -- the information nor the customer.

10      What you've done is copied the information in whatever

11  format, given it to the -- at that point in time, the seizure --

12  the -- at that point in time, the Government has it, it's

13  disclosed to the Government pursuant to the warrant, for the

14  legitimate investigatory reasons, because they're conducting a

15  criminal investigation.

16      MR. HINNEN:  I -- I think, the interference with the

17  right of privacy is when the Government compels the provider to

18  engage in a process, that results in the production of the --

19      THE COURT:  They -- they compel disclosures based upon

20  probable -- this is -- the --

21      MR. HINNEN:  Absolutely.

22      THE COURT:  -- Government is compelling you, because

23  they know you have the information and they have probable cause

24  that a crime is committed --

25      MR. HINNEN:  That's right, your Honor.

1          THE COURT:  -- and that is evidence of a crime.

2          So, we -- we compel people all the time.

3          MR. HINNEN:  That's right, your Honor.

4          And -- and that's why Judge Lynch was right, that this

5    case is not fundamentally about privacy, this case is

6    fundamentally about where the conduct, the statute compels a

7    provider to engage in occurs.  It's not a Fourth Amendment

8    question, it's just a question of what steps are necessary for

9    the provider to implement the statute and whether any of those

10   steps take place outside the United States.

11         THE COURT:  All right.

12         So, maybe -- maybe -- maybe, I'm a little bit slow on

13   this thing.

14         But the Government compels the disclosure and somebody

15   sitting at a computer someplace in the United States comes up

16   with a program and, bingo, from the United States they produce

17   it pursuant to the warrant.

18         How is that -- why is that not a relevant point of --

19   of the --

20         MR. HINNEN:  Well --

21         THE COURT:  -- the critical point relevant to the

22   purposes of the statute?

23         MR. HINNEN:  Yeah.

24         I -- I think the answer, your Honor, is because it --

25   that analysis skips several essential and compelled steps, so

1   first the --

2           THE COURT:  It doesn't matter, the whole thing is

3   compelled.

4           MR. HINNEN:  That's correct.

5           THE COURT:  -- from the beginning, it doesn't matter

6   what --

7           MR. HINNEN:  -- that's correct and that's -- that's

8   why every step of the process has to occur inside the United

9   States or it's an improper extraterritorial a --

10          THE COURT:  All of it -- all of it --

11          MR. HINNEN:  All of it.

12          THE COURT:  -- a hundred percent of it?

13          MR. HINNEN:  Absolutely, that's what Morrison says.

14          THE COURT:  Morrison --

15          MR. HINNEN:  It --

16          THE COURT:  -- first of all, Morrison, I think I read

17  Morrison regarding the extraterritorial application of the --

18  the Foreign Exchange Commission law, that statute law --

19          MR. HINNEN:  Hm-hmm.

20          THE COURT:  -- for that statute.

21          MR. HINNEN:  Correct.

22          THE COURT:  And I don't -- I don't even think that

23  this is -- that -- well, I'm not so sure, that -- that, because

24  that -- the Government's position is not that -- that that is --

25  that this statute applies, the extraterritorial, the

1   Government's position is that this is a domestic application of

2   statute and that you look to -- to the relevant conduct for the

3   purposes of the statute, which is privacy or balancing, whatever

4   -- the law-enforcement balancing, that the -- the conduct occurs

5   here in the United States, including the retrieval and the

6   assembling of the information in whatever format to be turned

7   over to the Government.

8           MR. HINNEN:  So, I -- I don't think --

9           THE COURT:  So -- so, you mean to say that, just

10  because somebody has to reach out and get that information that

11  you sent abroad back into the warehouse or into the -- the

12  network, that that is -- is fatal, for purposes of the statute?

13          MR. HINNEN:  I -- yes, your Honor, the only -- the

14  only part of that, I might take issue with is -- is the just

15  because, that's the whole ball game with respect to data that's

16  stored overseas.

17          THE COURT:  Morrison was a foreign --

18          MR. HINNEN:  Correct.

19          THE COURT:  -- a foreigner --

20          MR. HINNEN:  Correct.

21          THE COURT:  -- who brought a class action in the

22  United States getting access under that law in the United

23  States --

24          MR. HINNEN:  Yes.

25          THE COURT:  -- because they felt that they were

1 cheated, right? And the court said, you do not have a claim,

2 because all of the conduct occurred in the United States, it --

3 he bought the stocks in the foreign exchange in conduct, even

4 though some of the conduct here impacted. Obviously, they

5 wouldn't have filed a lawsuit here, if they would have not been

6 aggrieved.

7           MR. HINNEN: Yes.

8           THE COURT: And the Supreme Court said, no, that's --

9 you know, you're out of -- you can't come to -- you don't have a

10 case.

11          MR. HINNEN: Right.

12          So, I think the analysis in <u>Morrison</u> is not

13 particularly -- the specific analysis in <u>Morrison</u> -- is not

14 particularly relevant to this case. The test and the framework,

15 ah, established in <u>Morrison</u> is -- is directly relevant to this

16 case.

17          And your Honor, I'd point it's -- it's cited on --

18          THE COURT: But the test doesn't say, if one little

19 piece of -- of relevant conduct occurs overseas, that the whole

20 ball of wax -- that the whole statute is out.

21          MR. HINNEN: It does say, that the conduct relevant to

22 the focus of the statute -- not the focus of the statute, itself

23 -- the conduct relevant to the focus of the statute, all of the

24 conduct relevant to the focus of the statute must occur in the

25 United States and --

1          THE COURT:  But it does, right, because all they do is

2    retrieve stuff that is -- in unreadable form -- from wherever.

3          MR. HINNEN:  The --

4          THE COURT:  Look, let me see if -- if it was in a

5    satellite, you'd google now a satellite and you send it to the

6    satellite, would that be outside the bounds?

7          MR. HINNEN:  It depends --

8          (Laughter at 10:32 a.m.)

9          MR. HINNEN:  -- I am assuming the satellite is outside

10   U.S. air space for the purposes of our hypothetical, your Honor?

11         (Laughter continues.)

12         THE COURT:  All right.

13         But -- but put it wherever you want.

14         (Whispering held off the record.)

15         MR. HINNEN:  Ah, under the current statute, yes, I

16   don't think Congress anticipated storing documents on satellites

17   in 1986, anymore than it anticipated that Google might store

18   them in France or England.

19         THE COURT:  Right.

20         You're storing someplace where you've got a room, you

21   might be looking at -- at that space --

22         MR. HINNEN:  The data center on the moon, your Honor,

23   yes.

24         THE COURT:  -- but your argument would be the same,

25   it's outside of the territory of the United States, no country

1    could claim it, but the United States cannot claim it, either.

2          MR. HINNEN:  Certainly, our argument would still be

3    that before we'd get into data -- data center in space, your

4    Honor, the statute needs to be amended, because Congress wasn't

5    thinking about that in 1986.

6          THE COURT:  Okay.

7          MR. HINNEN:  And, your Honor, you asked, well, where

8    -- where does Morrison say that, you know, all of the relevant

9    conduct has to be in the United States?

10         The Supreme Court -- the best and most concise place,

11    the Supreme Court says, it is actually in the RJR Nabisco case

12    and it's at Page 2090 and it's on Page 9 --

13         THE COURT:  I have it.

14         MR. HINNEN:  -- of our reply.  And I think that --

15    that might be helpful.

16         I want to loop back really briefly, you asked me a

17    couple of questions about why Magistrate Reuter's analysis was

18    -- was incorrect and you listed a number of factors that

19    occurred in the United States --

20         THE COURT:  Right.

21         MR. HINNEN:  -- the personnel are in the United

22    States, the criminals are in the United States, those kind of

23    things, right, Judge Rueter cites to those as well and relies on

24    them to some degree.

25         Those would be perfectly rational factors to consider

1  in constructing a statute and Congress could expressly have

2  taken those issues into account and said, if the following

3  factors are in the United States, it doesn't matter whether it's

4  in the United States or outside of the United States, the data,

5  itself, is stored inside or outside the United States.

6       That would be a very different statute than Congress

7  wrote in 1986, when it enacted the SCA, those factors don't

8  appear anywhere in -- in the statute.  And even if they did,

9  they would obviate the fact that the Morrison test as

10 articulated in the RJR Nabisco case requires all relevant

11 conduct to occur in the United States.

12      (Pause and whispering held off the record at 10:34

13 a.m.)

14      THE COURT:  Okay.

15      MR. HINNEN:  And the one other -- the one other thing,

16 I would say about Magistrate Judge Rueter's decision is, he

17 spends some time focusing on some of the unusual and in some

18 ways, un --

19      THE COURT:  Well, hold on a minute.

20      MR. HINNEN:  Sure.

21      THE COURT: You're talking about Morrison and in

22 Nabisco I'm going to read to you what does -- whatever this

23 means, in Nabisco, the two-step framework, is the:

24      So, at the first step, we asked whether the

25      presumption against extraterritoriality has been

1    rebutted --

2            That is, whether the statute is a clear and

3    affirmative indications that it applies extraterritorially.

4            -- we must ask the question regardless of whether

5        the statute in question relates conduct, affords

6        relief or merely confers jurisdiction.

7            If the statute is not extraterritorial --

8            Which I don't think the Government is debating that.

9            -- then, at the second step, we determine whether

10       the case involves a domestic application of the statute.

11       And we'd do this by looking at the statute's focus, if

12       the conduct relevant to the statute's focus occurred in

13       the United States, then the case involves a permissible

14       domestic application even if, other conduct occurred

15       abroad.  But if the conduct relevant to the focus

16       occurred in a foreign country, then the case involved

17       impermissible extraterritorial application, regardless

18       of any other conduct that occurred in U.S. territory.

19           I've read that correctly, that is the test, right?

20           MR. HINNEN:  That's -- that's exactly the test, I have

21   in mind, your Honor.

22           THE COURT:  So, going back to my previous question --

23           MR. HINNEN:  Yes.

24           THE COURT:  -- ninety-nine percent of the conduct

25   happened here, except that -- that you developed the program and

1    you retrieve the information from wherever it was, multiple

2    countries at -- from different times.

3         So, even if that conduct happened, doesn't -- is this

4    still a domestic application of the statute?

5         MR. HINNEN:  So -- so, I would say, no, for two

6    reasons, your Honor.

7         First, I would say that ninety-nine percent of the

8    conduct with respect to data stored in a foreign data center

9    does not occur in the United States.  I wouldn't say that,

10   ninety-nine percent of it occurs outside the United States, but

11   I'd say, the vast majority of it occurs outside the United

12   States.  All that happens from the United States is the

13   individual queries, the foreign network.

14        THE COURT:  But that's significant, because I gave you

15   -- I -- because you have access to the whole ball of wax, you

16   sent it there.

17        MR. HINNEN:  It -- it's significant.  But it's not the

18   majority -- you know, it's sort of not the majority of the

19   activity involved in identifying, isolating and retrieving data

20   stored in foreign data centers.

21        All of that conduct which is conduct undeniably,

22   conduct relevant to the execution of a warrant issued under the

23   Stored Communications Act occurs in the data center outside the

24   United States, where the server says, okay, you've asked me, do

25   I have any data that applies to Count X, let me look through the

1    data in my data center, I do, I have the following documents.

2         Then, you can imagine another query, okay, please

3    isolate those documents.  Okay, I've isolated those documents.

4    Okay, please send those documents from your data center in --

5    let's say -- France to the United States, so that they can be

6    produced.

7         All of that computing, all of that isolation, all of

8    that compilation, all of that transmission occurs from the

9    foreign data center, that's the -- those are the essential steps

10   necessary to produce the data from a foreign data center.

11        The fact that the person happens to be sitting here --

12   the person is almost irrelevant -- the fact that the person

13   happens to be sitting at a keyboard in California --

14        THE COURT:  But that --

15        MR. HINNEN:  -- is a very small part of the process --

16        THE COURT:  -- would -- take the person out, could you

17   do anything without the -- the -- could you do anything with

18   that person -- it seems to me, that you're pushing the envelope

19   a little bit here.  Because you can't do anything without that

20   person, nothing could be retrieved whether in the United States

21   or outside of the United States without that person.

22        MR. HINNEN:  That's true, your Honor, but it's also

23   true of the foreign data center, I couldn't do any of those

24   things without the foreign data center searching its data,

25   isolating its data, compiling its data and transmitting its

1  data, either.

2       So, I agree with you that the person, who initiates

3  the query is an -- is an essential part of the process, it's --

4       THE COURT:  He is the key to the process, isn't he?

5       MR. HINNEN:  Ah --

6       THE COURT:  You -- IT people are becoming

7  indispensable to the process and he's sitting at a computer

8  someplace in California, developing the program and retrieving

9  the information, even if the information was in space.

10       MR. HINNEN:  He is a necessary part of the process,

11  he's not -- he is not a sufficient part of the process, in other

12  words, without --

13       THE COURT:  Well, hold on a minute, hold on a minute.

14       MR. HINNEN:  Okay.

15       THE COURT:  How many people do you need to retrieve

16  this information?

17       MR. HINNEN:  Ah, usually, I think, it -- it varies,

18  because different people specialize in the different services --

19       THE COURT:  All right.

20       MR. HINNEN:  -- but a small number of people.

21       THE COURT:  All right.

22       And they all are where?

23       MR. HINNEN:  They are all in California, your Honor.

24       THE COURT:  All right.

25       So, they are the key essential personnel for -- for

1  you to comply with the warrant, right?

2          THE DEFENDANT:  That's correct, your Honor.

3          THE COURT:  And they are all here?

4          MR. HINNEN:  That's correct, your Honor.

5          THE COURT:  Does it matter where the information is?

6          MR. HINNEN:  Yes, your Honor.

7          THE COURT:  All right.

8          (Laughter at 10:39 a.m.)

9          MR. HINNEN:  And -- and Congress, certainly, could

10  have written a statute that says, as long as the person is

11  located in the United States, ah, you know, data from anywhere

12  in the world, can be retrieved and produced.  But Congress --

13  but Congress --

14          THE COURT:  Right.

15          MR. HINNEN:  -- didn't write that statute.

16          THE COURT:  So, on the steps that occurred abroad, at

17  least, you say, you're -- you're trying to -- if I understand

18  your argument correctly, you say, even though this person is

19  here, there's a lot of steps that are occurring abroad, the

20  searching foreign data centers, right --

21          MR. HINNEN:  Correct.

22          THE COURT:  -- isolating the data, compiling the data

23  and then, assembling to be returned, okay, did I miss any steps?

24          MR. HINNEN:  No, your Honor that --

25          THE COURT:  Those -- those are the three essential

1  steps, locating it -- I am not going to use word, search --

2          MR. HINNEN:  That's fine.

3          THE COURT:  -- I'm going to use locating or finding

4  it, because --

5          MR. HINNEN:  Yes.

6          THE COURT:  -- that's access --

7          MR. HINNEN:  Yes.

8          THE COURT:  -- that you have.

9          Isolating it, right --

10         MR. HINNEN:  Correct.

11         THE COURT:  -- to make sure that it covers the period

12  of time between Day 1 and Day 30, whatever.

13         MR. HINNEN:  And that it applies to a Count X, that's

14  subject to the --

15         THE COURT:  Right.

16         MR. HINNEN:  -- warrant, not at Count Y.

17         THE COURT:  And then, returning it in some readable

18  form to the United States, those are the three -- or four --

19  essential steps, right?

20         MR. HINNEN:  They're -- and, your Honor, neither of us

21  are computer scientists, but very generally speaking, yes, I

22  think that's accurate.

23         THE COURT:  But developing the program -- the writing

24  of the program, that is going to allow you to take all of those

25  steps that happened here --

1        MR. HINNEN:  That's correct.

2        THE COURT:  -- with the limited number of people that

3    you have that are sitting someplace in -- in Google's

4    brainstorming and developing a program that is going to be

5    responsive to the -- the warrant?

6        MR. HINNEN:  Well, I'm -- I'm not sure about that,

7    actually, your Honor, I -- I should pause.

8        Google has development people all over the world and I

9    don't know where they -- where they write the scripts and

10   whether there are any foreign personnel involved in that

11   process.

12       THE COURT:  Okay.

13       MR. HINNEN:  I -- I don't -- I would argue that where

14   the query is written is relevant to the <u>Morrison</u> analysis, but I

15   don't know as a matter of fact whether anyone outside the United

16   States was -- was involved in writing these queries or not.

17       THE COURT:  Right.  So, you don't know that?

18       MR. HINNEN:  I don't know that, your Honor.

19       THE COURT:  Okay.

20       MR. HINNEN:  I -- I would say that, when they're

21   writing that query, they'd have to determine whether it will be

22   limited to data centers in the United States or whether, in

23   fact, it will also apply to data centers outside the United

24   States.

25       THE COURT:  Okay.

1          Now, what server is running the application that you

2    have developed to be responsive to -- to the subpoena, is that

3    service whether in the United States or outside of the United

4    States, where is the server that you used to produce the

5    information?

6          MR. HINNEN:  It's -- it's both, your Honor.

7          And that's -- that's what I was sort of trying to get

8    at with my dialogue between the server in the United States and

9    the server overseas.

10         The small computer programmer, the script would cause

11   the computer in California to say to data centers wherever the

12   script told it to, do you have any data that falls within the

13   scope of this warrant?

14         THE COURT:  All right.

15         MR. HINNEN:  And if it did, then that -- in our

16   example, that foreign data center would have to say, yes, I do.

17         So, it's a process that has to run on both servers

18   because if it doesn't, then the server in California or the

19   computer in California is blind to what is on the server outside

20   the United States.

21         THE COURT:  And then, I am going to repeat the

22   question and give you another shot at it --

23         MR. HINNEN:  Thank you, your Honor.

24         THE COURT:  -- but where does it interfere with the

25   customers' privacy occur, something that Judge Rueter has asked

1   and -- and you still maintain that -- where is the privacy

2   violation?

3           MR. HINNEN:  It's a result of the process of obtaining

4   the warrant and compelling --

5           THE COURT:  When does it begin and when does it end?

6           MR. HINNEN:  It -- it begins when the Government

7   obtains a warrant compelling a provider that has a relationship

8   of trust with a user to go out and search its network --

9           THE COURT:  But the Government has probable cause --

10          MR. HINNEN:  I agree, your Honor.

11          THE COURT:  -- and that trumps -- that protects

12  privacy.

13          MR. HINNEN:  Absolutely, your Honor, and for --

14          THE COURT:  I mean, the Government has a warrant that

15  protects privacy.

16          MR. HINNEN:  That's right, your Honor.

17          And for that reason, Google is not contesting any of

18  the searches that needed to be conducted inside the United

19  States, because Google recognizes that in the United States, a

20  warrant is the gold standard with respect to privacy.

21          So, this issue is -- is not about -- for Google --

22  whether a warrant adequately protects privacy, it's about

23  whether a warrant can compel the production of documents that

24  are stored outside the United States.

25          THE COURT:  So, if I understand it correctly, you are

1    taking the position, that the point of access or the location of

2    where the Google legal investigation support personnel gains

3    access to the information and brings it back to the United

4    States is not relevant, that the relevant conduct is what

5    happens at the various overseas or at the various data centers

6    where the data is stored?

7              MR. HINNEN:  I'm -- I'm not saying, your Honor, that

8    none of the conduct that occurs in the United States is

9    relevant.  I am only saying that --

10             THE COURT:  But that's the --

11             MR. HINNEN:  -- the conduct that occurs outside the

12   United States is relevant to the focus of the statute as well.

13             THE COURT:  -- but it's really because the information

14   is still there, because you sent it there --

15             MR. HINNEN:  That's correct, your Honor and --

16             THE COURT:  -- you put it outside the reach of the

17   Government.

18             MR. HINNEN:  That's correct, your Honor.

19             And in -- in this -- there are areas in which Congress

20   tells service providers how to behave, it says in Colea (ph) for

21   instance --

22             THE COURT:  That's -- it's all communications, one of

23   those areas.

24             MR. HINNEN:  It's not, your Honor, no.

25             The Stored Communications Act takes a service provider

1   as it finds it.

2          If Google stored none of this data and the Government

3   served a warrant, there would be nothing wrong with Google

4   saying, I'm sorry, we have none of that data.

5          THE COURT:  Okay.

6          MR. HINNEN:  There's -- there's nothing that the

7   Stored Communications Act requires a communication service

8   provider to do, other than protect the privacy of its customers'

9   records and communications, unless and until a piece of legal

10  process is issued under 2703 and a process is begun that results

11  in the disclosure of -- of that information.

12         THE COURT:  So -- so, if I understand it, it's a

13  compelled process and whether or not, it's stored overseas is a

14  relevant determining factor in deciding whether the -- the

15  customer's privacy was invaded from your perspective, right?

16         MR. HINNEN:  It -- it's conduct relevant to the focus

17  of the statute, yes, your Honor --

18         THE COURT:  All right --

19         MR. HINNEN:  -- it's part --

20         THE COURT:  -- all right.

21         MR. HINNEN:  -- an essential part of the process.

22         THE COURT:  All right.

23         But it -- but I've read the statute, I've read the

24  test before and it seems to me, that even -- even if the conduct

25  relevant to the focus of -- some foreign country, not -- not

1    necessarily -- well, I will hear the Government, they're going

2    to respond.

3            But my question is, the citizenship of the person

4    doesn't matter, right?

5            MR. HINNEN:  That's correct, your Honor.

6            THE COURT:  So, even if it's a foreign citizen, that

7    -- that is not relevant at all?

8            MR. HINNEN:  No, under the current statute, your

9    Honor.

10           That would be a factor Congress could consider

11   incorporating into an amended statute and might want to, given

12   the fact that the Internet is now global.  But under the --

13   under the current statute, it doesn't speak to the citizenship

14   of the -- of the user or subscriber at all.

15           THE COURT:  All right.

16           You will agree that some of the -- the privacy concern

17   addressed in the statute is the unauthorized access and the

18   disclosure of the customers information, right?

19           MR. HINNEN:  I think the focus of the statute, your

20   Honor, is -- that is the -- that is the privacy concern

21   addressed in the statute, yes, your Honor.

22           THE COURT:  Okay.

23           So, if Google is authorized to -- as to the customers

24   at any point in time, isn't then, the appropriate focus as to

25   whether the disclosure occurs?

1    MR. HINNEN: I don't think so, your Honor.  I think the

2    appropriate focus is on exactly what Section 2703 sets forth

3    which is a process for the Government to compel a provider to

4    engage in a process, that results in the disclosure of

5    communications.  And that process, it's -- it follows pursuant

6    to a warrant, it involves lower cases s's, here your Honor, it

7    involves a search and seizure or in your Honor's terms, it

8    involves an inquiry and a consolidation and a retrieval just to

9    stay away from Fourth Amendment terms.

10   THE COURT:  Yeah, but it -- so, the access -- you have

11   a right of access and -- and access means to be able to find

12   something, of course, if you find something, you'd have to look

13   at it, right?

14   It -- it doesn't mean searching, you -- you know, the

15   Government does the searching after they get the -- the document

16   or the information, the Government rifles through it very

17   carefully to find out whether there is any evidence of a crime,

18   that's a search.  What you do is just grant access to the data,

19   right?  It's a little bit -- it's --

20   MR. HINNEN:  Well --

21   THE COURT:  -- it's part of the process, it's a step

22   but it's not the equivalent of what we'd call a traditional

23   search and seizure.

24   MR. HINNEN:  I don't think -- and, your Honor, I don't

25   think we'd need to answer that question from a Fourth-Amendment

1   perspective today.

2           Certainly, Google separates the communications with

3   respect to that particular user from the communications of its

4   hundreds of millions of other users in data centers all around

5   the world.

6           So, it identifies -- just to approximate -- it

7   identifies the .0001 percent of the data and communications on

8   its network, that are responsive to that particular thing and

9   separates it out, whether we'd want to call that a search or

10  whether we'd want to call it --

11          THE COURT:  Excuse me, that's not necessarily, the

12  search --

13          MR. HINNEN:  -- and finding --

14          THE COURT:  -- that's totally something -- and that's

15  what you'd do in locating it for -- for the Government in

16  response to the warrant.

17          MR. HINNEN:  And, again, your Honor, I'm happy to call

18  it anything, because for the purposes of the Morrison analysis,

19  it doesn't matter whether it's a Fourth-Amendment search, it

20  only matters whether it's conduct relevant to the focus of the

21  statute and it very clearly is that, the statute just could not

22  function, if that step didn't occur.

23          THE COURT:  So, if -- if I accept your argument, your

24  logical conclusion is, the Government is out of luck, they will

25  never be able to get anything from Google that is stored

1    overseas, because you have it spread all over the world.

2         And there was an indication in the stipulation, that

3    some of the stuff -- or customers' account data -- may be spread

4    in multiple countries, even one piece of information may be

5    spread throughout the world --

6         MR. HINNEN:  That's correct, your Honor and -- and --

7         THE COURT:  -- and they're out of luck.

8         MR. HINNEN:  They're out of luck until Congress amends

9    the statute, yes.  So, it's thirty-one years after it was

10   passed, it's -- it's long overdue to sort of catch up with

11   modern technology.

12        And yes, as the statute currently applies to a global

13   network, unfortunately, one of the ramifications of the statute

14   Congress wrote in 1986, is that that information is not

15   accessible to the Government.

16        THE COURT:  And even though the 2703, it compels

17   disclosure based upon probable cause, you -- your position is

18   that, because it is compelled and you have take all of these

19   steps, that -- that anything that is in the United States is --

20   it's fair game, but anything that is outside of the United

21   States is not relevant to the inquiry?

22        MR. HINNEN:  That's correct, your Honor.

23        2703 with respect to data stored outside the United

24   States, requires a service provider to take steps outside the

25   United States and it --

1            THE COURT:  No, no, no --

2            MR. HINNEN:  -- and it couldn't work, if it didn't.

3            THE COURT:  -- the information is outside the United

4    -- the information is outside the United States, they're here,

5    whichever provider --

6            MR. HINNEN:  The -- the conduct is outside the United

7    States, the -- the finding, the iso --

8            THE COURT:  But you said, the infor -- the data that

9    you for business reasons sent outside of the U.S. territory is

10   someplace else, but Microsoft, all the IT people, all the --

11   with the -- with the intelligence, all the people that are going

12   to write the program and apply that program and retrieve that

13   information, in pretty relative -- short order -- are here in

14   the United States.

15           MR. HINNEN:  The people responsible for querying the

16   network and retrieving the documents --

17           THE COURT:  Right.

18           MR. HINNEN:  -- are here in the United States, yes.

19           THE COURT:  Okay.

20           And -- and of course, we don't know -- look at how

21   much of the information is out -- we don't know, in terms of

22   these customers -- in terms of these customers' accounts, the

23   volume of information relative to volume of information that is

24   in the United States, it does not matter, right, it's not

25   relevant?

1          MR. HINNEN:  Ah, it's rele -- it's relevant to -- I

2     think -- the impact it has on the Government's investigation, if

3     ninety percent of the data is in the United States and Google is

4     able to produce that, obviously, that's much more helpful to the

5     Government's investigation, than if only ten percent were in the

6     United States.

7          THE COURT:  Okay.  I think I see.

8          I was going to ask you a question regarding the

9     suggestion in the briefing, that enforcing the warrant required

10    the service provider to retrieve and disclose data that if

11    sought overseas might create a conflict with foreign law or

12    might require a service provider to violate foreign law.

13         Can you give me one example of how a conflict may

14    exist or -- or may be violated or -- or -- because I didn't see

15    any concrete example?

16         MR. HINNEN:  Absolutely, your Honor.

17         THE COURT:  Go ahead.

18         MR. HINNEN:  Countries all over Europe and around the

19    world have what's called, blocking statutes and they prevent --

20    they prevent a court in the United States from requiring a

21    service provider in the United States to retrieve documents from

22    inside their jurisdiction for production in -- in a U.S.

23    procedure.

24         THE COURT:  Well, regardless of whether it's a U.S.

25    citizen or not?

1          MR. HINNEN:  Regardless of whether it's a U.S. citizen

2    or not, your Honor.

3          And one might speculate that those -- those statutes

4    are as out of date and as ill-suited to the modern Internet as

5    the SCA is and that they, too, should be amended, so that we'd

6    have a coherent framework that exists, not just in the United

7    States but in foreign countries.

8          But -- but, yes, it is prohibited under many -- many

9    European countries' blocking statutes and we'd be happy to

10   submit supplemental briefing on this, if it's important to your

11   Honor, prohibits the disclosure of data stored in those

12   countries outside of those countries pursuant to a court order

13   -- a U.S. court order.

14         THE COURT:  Okay.

15         What data or what information does -- because what you

16   have is just -- what -- isn't it symbols and the numbers of

17   zeros which is stored in those -- in those data centers?

18         MR. HINNEN:  Some of it is, some of it's -- some of it

19   is full e-mails.  Sometimes, all of the pieces will be in one

20   data center, so it's easy to reassemble them in that one data

21   center, without going outside the -- the country, it really --

22   it really depends on the service and the particular technology.

23         THE COURT:  All right.

24         I think I -- I interfered with your argument a lot,

25   but I am going to give you an opportunity to make your argument,

1  I think you've answered some of my questions.

2         MR. HINNEN:  Great, thank you, your Honor.

3         And I'll -- I'll try to be very brief, because we have

4  had a chance to discuss this at some length at this point.

5         So, just sort of, I think, picking up where we left

6  off.

7         The second part of the Morrison test, the Government

8  -- the Magistrate Judge -- found and the Government has conceded

9  that in the first part, Congress did not intend for the Stored

10 Communications Act to apply extraterritorially.

11        So, as your Honor has pointed out, it has to be the

12 Government's position, that all of this is just a domestic

13 application and that no conduct relevant to --

14        THE COURT:  Right.

15        MR. HINNEN:  -- the statute occurs outside the United

16 States.

17        To parse that -- that quote from -- from RJR Nabisco a

18 little bit and we'd do this in our -- in our reply brief as

19 well, your Honor, where it talks about, even if other conduct

20 occurred abroad, that's very clearly distinguishing other

21 conduct from conduct relevant to the statute, the way that

22 sentence is structured.

23        So, if conduct relevant to the statute's focus

24 occurred in the United States, then the case involves a

25 permissible domestic application, even if other conduct -- other

1    conduct, not relevant to the focus of the statute -- occurred

2    abroad.

3              THE COURT:  But that's not what it said, though.

4              MR. HINNEN:  That's not, it's -- it's very clear from

5    the structure of the sentence, your Honor.  There is no point --

6              THE COURT:  If the conduct relevant to the statute's

7         focus occurred in the United States, then, the case

8         involves a permissible domestic application, even if

9         other conduct occurred abroad.

10             It doesn't say, even if other relevant -- it doesn't

11   say anything --

12             MR. HINNEN:  I agree, it doesn't --

13             THE COURT:  -- one way or the other.

14             MR. HINNEN:  -- I agree it doesn't say it, your Honor,

15   but the only way the distinction makes sense, is if the other

16   conduct referred to in the second half of the sentence, is

17   distinguishing it from the relevant conduct referred to in the

18   first half of the sentence.

19             And I think it makes it even --

20             THE COURT:  And the second half of the sentence

21   doesn't say, but if the conduct relevant to the focus occurred

22   in a foreign country -- it doesn't say where -- but if the

23   conduct relevant to the focus occurred in the foreign country,

24   meaning the conduct, right, it doesn't -- some of it could be

25   and some of it cannot be, right?

1    MR. HINNEN: It says, the conduct relevant to

2  the focus of the statute.

3    So, if -- if conduct relevant to the focus of the

4 statute occurred in a foreign country, then the case involves an

5 impermissible extraterritorial application.

6    THE COURT: And you are taking the position, that

7 means, the -- the -- any part of the conduct?

8    MR. HINNEN: That's correct, your Honor, there is no

9 distinction, there's no carve out, if any of the relevant

10 conduct occurs in the foreign country, then the case involves an

11 impermissible-extraterritorial application.

12    THE COURT: Okay. I think, I understand.

13    MR. HINNEN: Okay.

14    One -- one place, I think, other courts have made a

15 mistake and I think was part of the mistake that Magistrate

16 Judge Rueter made as well, is they've tried to determine just

17 where the focus of the statute exists. And they've said, well,

18 the focus of the statute is privacy, so where does privacy

19 exist?

20    It's the wrong question, it's not the question

21 Morrison asks the court to answer. What Morrison requires the

22 court to answer is, where does the conduct relevant to the focus

23 of that statute exist?

24    So, even if -- the impact on privacy occurred in the

25 United States at the time of disclosure, conduct relevant to

1    that disclosure occurs outside the United States, the process

2    without which that disclosure could not occur, several steps of

3    that process occur outside of the United States.

4         And so, we have a situation where conduct that is

5    required by the statute, no provider would be undertaking this

6    conduct, if -- if they weren't compelled to do so by a warrant.

7    No provider would be querying their network and saying, please,

8    give me all the e-mail for Todd Hinnen and send them back here

9    to me in the United States.

10        The conduct is required, the conduct is essential to

11   the effective functioning of the statute, so it's not only

12   relevant, but it's required and essential, it fits squarely

13   within the second prong of the Morrison test.  And at the end of

14   the day, that's what is fatal to the Government's argument.

15        And the Government in order to prevail, has to argue

16   that the conduct the statute compels is not relevant to the

17   focus of the statute.  It has to argue that the finding,

18   compiling, all of that kind of stuff, that the warrant requires

19   Google to undertake, isn't relevant to the focus of the statute,

20   because if it is and that conduct occurs outside the United

21   States, Morrison tells us, that's an impermissible-

22   extraterritorial application of the statute.

23        THE COURT:  Very well.  Thanks for your very technical

24   argument.

25        MR. HINNEN:  Ah, I think we've covered most of that,

1    your Honor.

2         You know, we talk about this quite a bit in our

3    briefing, Congress's choice of the term, warrant is not at all

4    accidental, if you'd look at the structure of 2703, it provides

5    different kinds of legal process that involve different

6    procedures and different safeguards.

7         And with respect to the most sensitive kind of -- of

8    data, communications content, it requires a warrant, which

9    involves a process of execution and all that that entails.

10        And so, it intended to use -- as your Honor had said

11   -- that gold standard for privacy, the gold standard by virtue

12   of which the U.S. searches are constitutional in order to

13   protect those communications.  And -- and with that term, when

14   Congress used it in 1986, it imports all that goes with the

15   warrant including the process of an execution and the search of

16   places in order to identify things, including the territorial

17   limitations and that kind of thing.

18        Just briefly, your Honor, let me review my argument

19   here and try and very succinctly identify anything that I

20   haven't touched on yet.

21        (Pause at 10:59 a.m.)

22        MR. HINNEN:  I'd just -- I guess, just two points in

23   closing, your Honor.

24        The Government puts forth a number of arguments in its

25   -- I think -- thirty-three-paged opposition brief, none of those

1    arguments speaks directly to the <u>Morrison</u> test or alters its

2    application to this case.

3         None of them changes the fact that much of the

4    essential conduct, the Government seeks to compel with the

5    warrant takes place outside the United States.  None of them

6    alters the conclusion that enforcing the warrants as to such

7    communications -- communications stored outside the United

8    States -- would be an impermissible-extraterritorial application

9    of the warrant provision and, therefore, the warrants must be

10   quashed.

11        This is not to say, that applying this 1986 statute to

12   a network, that didn't exist and wasn't even conceived of at the

13   time Congress wrote the statute, doesn't have some unusual and

14   even in some cases, your Honor, unfortunate impacts.

15        Modernizing that statute, though, involves weighing

16   the interests of a number of different stakeholders, not just

17   the Government and providers, but users and foreign governments

18   and privacy organizations and that kind of thing.

19        And it involves a number of very, very complex policy

20   issues as well, law-enforcement capabilities, user privacy,

21   international trade with respect to digital goods, international

22   cooperation with respect to -- to law-enforcement

23   investigations, international sovereignty with respect to data.

24   Congress hasn't considered any of those issues, that would be

25   impacted --

1          THE COURT:  But Congress -- they have had

2     opportunities and have had looked at a couple of other things

3     and have tackled other laws.

4          I think the -- the Act -- did they have a reason to

5     know or find out, that this is not a workable -- it's been

6     working for so long, you've been producing under the same

7     statute for so long.

8          And suddenly, as of this summer, you begin to --

9     Congress might not even know there was a problem --

10         MR. HINNEN:  So --

11         THE COURT:  -- that might not be even that question,

12    but --

13         MR. HINNEN:  Well, I think a couple of things.

14         First, Google and many other providers were engaging

15    with various parts of the Government to try and modernize and

16    reform the Stored Communications Act, before the Microsoft

17    decision ever came down.  I am not contesting for a second, the

18    -- your Honor's proposition that Google did comply with -- with

19    warrants in a different way, before the Second Circuit announced

20    that rule.

21         And second, the flip side of that coin, I think,

22    applies with equal force, your Honor, any time -- and if

23    Congress already meant for warrants to apply to data outside the

24    United States, at any time in the nearly ten months now, since

25    the Second Circuit handed down this decision, while it's been

1 very evident that the Government is having conflicts with

2 providers in different jurisdictions -- different providers in

3 different jurisdictions around the country -- at any time,

4 Congress could have passed a short statute that said, hey,

5 sorry, we weren't clear, we really intended for this to apply to

6 data stored outside the United States.

7 And they haven't done that, there is nothing

8 indicating in 1986 when Congress passed this statute, that they

9 considered that, there is nothing in any subsequent statute,

10 that indicates that Congress considered data stored outside the

11 United States.

12 And I -- I think, we've effectively in the briefing,

13 spoken to why relying on the ratification of a treaty by one

14 house of Congress, twenty years after a statute is passed, is --

15 is not a good basis for --

16 (Sneezing at 11:03 a.m.)

17 MR. HINNEN: -- a statutory interpretation for what

18 Congress meant in 1986.

19 So, at the end of the day, your Honor, unfortunately,

20 this is a problem that Congress has to solve. The Morrison

21 court was very clear, that it's not the province of the Court to

22 speculate as to what Congress would have wanted to be done, if

23 Congress had foreseen a problem.

24 The province of the Court is to apply the statute as

25 Congress passed it in 1986 and as Congress intended it to be

1    applied and that is limited to -- as the Government concedes in

2    Part 1 of the <u>Morrison</u> test -- it's limited to conduct inside

3    the United States, because the warrants in this case require

4    relevant conduct outside the United States, they must be quashed

5    to the extent that they do.

6              THE COURT:  Okay.

7              MR. HINNEN:  Thank you, your Honor.

8              THE COURT:  You're welcome.

9              (Pause at 11:04 a.m.)

10             MR. PAK:  Thank you, your Honor.

11             I have an argument prepared, but I think it may be

12   more helpful unless your Honor disagrees --

13             THE COURT:  But I -- I had a couple of questions --

14             MR. PAK:  Yes.

15             THE COURT:  -- to get you started and maybe, you will

16   have an opportunity to go back to your argument, but when we are

17   on the warrant, you argued that the warrant required by 2703 is

18   not a traditional interim warrant but a -- a personal warrant

19   akin to a subpoena.

20             If that's the case, why does the statute require the

21   Government to obtain a warrant issued using the procedures

22   described in the Federal Rules of Criminal Procedure,

23   particularly, 841?  And which procedures does the statute

24   incorporate and which procedures does the statute not

25   incorporate?

1      MR. PAK:  Sure.

2      So, specifically, the text of 2703, all the warrant --

3 all the portions of it -- that relate to obtaining a warrant,

4 specifically, only refer to procedures as opposed to saying, you

5 have to get what is a Rule 41 search warrant.

6      Furthermore, every time in that section, Congress used

7 the term, warrant and Federal Rules of Procedures, it's followed

8 by -- by a court of competent jurisdiction.  The definition of a

9 court of competent jurisdiction is in 18 USC, 2711.  And that

10 definition, specifically, trumps a lot of the procedures -- not

11 all of the procedures -- that can be found in Rule 41.

12      For example, Rule 41(b) has what are the traditional,

13 geographical limitations of a -- of a Magistrate Court issuing a

14 particular search warrant.  And if you're searching a house, it

15 needs to be in the district, if you're searching a car, it needs

16 to be in the district.

17      2711, the definition of a court of competent

18 jurisdiction, which is only used in tandem with reference to --

19 to the procedures of obtaining a warrant, specifically says that

20 a court is not bound, essentially, by geographical restrictions,

21 but a court will have jurisdiction over a particular -- where

22 the ability to give a particular warrant, if it has jurisdiction

23 over the offense being investigated.

24      And that certainly, that's Congress getting rid of the

25 traditional geographic limitations that are found, for example,

1    in Rule 41(b).

2          There are other changes, there are other ways in which

3    the Stored Communication Act supplants, the procedures that it

4    -- that it -- that are found in the Federal Rules of Civil

5    Procedure or sorry -- of Criminal Procedure.

6          For example, again, under that same definition of a

7    court of competent jurisdiction, your Honor could issue a search

8    warrant, whereas under Rule 41, typically, only a magistrate

9    could.  Any court, in fact, within a district that has

10   jurisdiction over the -- over the offense being investigated --

11   can issue such search warrants.

12         So, while the SCA, specifically, calls forward some of

13   the procedures that are outlined in the rules, it supplants many

14   of them.

15         So, the type of process that's created is a little bit

16   different, for example, under a traditional search warrant, what

17   -- what goes on, is a court authorizes law enforcement to take a

18   particular action within a particular place, within -- within

19   the reach of the court.  You can do X, Y and Z in furtherance of

20   your litigation, it doesn't involve a third party.

21         And the SCA does, the SCA has a specific authorization

22   to courts to say, you can compel a third party to do X, Y and Z,

23   to produce information in response to a warrant, to produce

24   information in response to a court order, to produce information

25   in response to a subpoena, that's fundamentally different.  And

1    in that way, grants courts with *in personam* power over the

2    provider as opposed to any kind of geographical limitation, that

3    you would find in a Rule 41 search warrant -- in a traditional

4    Rule 41 search warrant.

5           THE COURT:  Okay.

6           A question, in your view, is the physical location

7    where the disclosure to the Government occurred -- occurs --

8    well, let me just -- let's just -- why don't you respond to the

9    argument, he -- we are working with the Morrison test --

10          MR. PAK:  Yes.

11          THE COURT:  -- right and the Nabisco test.

12          And you heard the argument, that Mr. Hinnen has made

13   with regards to that test and the interpretation of what it

14   means in terms of the -- the conduct that is relevant to the

15   focus of the statute.

16          So, could you respond to that argument?

17          MR. PAK:  Yeah, absolutely.

18          THE COURT:  Because the language is, you know, when I

19   read it, I -- the language is not clear to me, but go ahead.

20          MR. PAK:  So, I think -- let -- let me backtrack from

21   the end of what Mr. Hinnen was saying, because there -- there

22   was a change, I believe, in -- in certain of the analyses that

23   he was providing with respect to Morrison.

24          So, at first, we're dealing with the question, what is

25   the conduct -- the statutory focus under a Morrison test, right?

1          THE COURT:  Right.

2          MR. PAK:  What is that conduct and --

3          THE COURT:  But you agree that he seems to be -- to be

4    saying, it's as balancing, because the -- the privacy is

5    balanced with the needs of -- of the Government to investigate

6    cases and gather information.

7          MR. PAK:  Yes, your Honor.

8          So, at -- at some point, he did say that, I -- I

9    think, the Government's position is twofold with respect to the

10   focus.

11         So, first, the focus by the text of the statute is two

12   things, there are two pieces of conduct, if you were to identify

13   them, that are being regulated when you look at 2703 in any of

14   its directives regarding search warrants.

15         One, it's compelled disclosure, that disclosure occurs

16   in the U.S.

17         Two, it's the requirement that the Government has to

18   get a search warrant, that also occurs in the United States.

19         So, under Morrison, our view is that we're sort of

20   done at that point.  The relevant conduct occurs -- all of it --

21   occurs domestically.

22         Now, Mr. Hinnen said, well, conduct relevant to the

23   focus is also appropriate to look at.  For example, Google has

24   to go out and reach out in to some of its foreign service in

25   order to get the data.

1          That's not the test, first of all, if -- if that were

2     the -- if that were the test, the <u>Morrison</u> case would be

3     different, the holding in <u>Morrison</u> would be different.

4          So, think for example, of the rule set forth by the

5     Supreme Court under <u>Morrison</u>, which says:

6          If you're going to proceed -- rather, the Securities

7     Exchange Act, the securities fraud provisions of those Acts

8     apply only to certain type of transactions, U.S. transactions or

9     transactions of securities listed on the National Exchange.

10          THE COURT:  Right.

11          MR. PAK:  Under the rule, you could actually have

12     someone pursue a securities fraud claim, where the fraud

13     occurred overseas.  You could have someone overseas pursue a

14     claim against somebody, even though they were defrauded in

15     Australia or somewhere else, as long as they met that one

16     requirement, that the exchange occurred, either, in the U.S. or

17     in a security that was listed on an exchange.

18          And in that way, what the Supreme Court -- the rule

19     that comes out of <u>Morrison</u> -- is basically, look, you have to

20     only look at what is identified -- what is the focus -- as

21     identified in the text of the statute.  And it doesn't matter

22     that there's other conduct that may be relevant to that focus,

23     that occurs overseas and --

24          THE COURT:  So, I want to interrupt you there.  So, I

25     think, you heard what I asked, what are the steps that took

1   place -- according to him -- in the process, once the warrant is

2   issued -- properly issued?

3           And is the searching of the data centers, the

4   isolating of the data, the compiling of the data, the returning

5   of the data, that that all happened outside -- overseas -- ah,

6   and that conduct -- because that conduct happened overseas, then

7   the test is not met?

8           I think that's what I understood -- if I understood it

9   incorrectly, you'll correct me later, but --

10          MR. PAK:  I think -- I think -- I think, Google's

11  position -- I -- and so, I don't think Google denies that a

12  portion -- and very important portion -- of what they do in

13  responding to a search warrant occurs here in the U.S. by

14  personnel in the U.S.

15          I think Mr. Hinnen's point was that there's -- the

16  data, itself, sits overseas --

17          THE COURT:   Right.

18          MR. PAK: -- and because the way that their code works,

19  it -- it necessarily queries data in a server somewhere else,

20  that there's a lot of action or activity that occurs overseas.

21          Keep in mind --

22          THE COURT:  But you're saying that -- that doesn't

23  really matter?

24          MR. PAK:  It doesn't matter.

25          THE COURT:  -- for purposes me applying the test and

1    determining that this is a domestic application of the Stored

2    Communications Act, because the only two things that matter is

3    the warrant was issued and the warrant compels disclosure and

4    the disclosure happened here?

5        MR. PAK:  Yes.

6        The other thing that would matter, your Honor is if,

7    for example, we were dealing with a Chinese e-mail provider or a

8    Canadian e-mail provider, that did business in those respective

9    countries and we tried -- the Government tried -- to use the SCA

10   to compel them to produce the information, that would,

11   obviously, be an extraterritorial application.  We're obviously

12   not doing that here, we're dealing with Google, which is a U.S.

13   provider headquartered -- you know -- in the United States.

14       But the way to look at it, analytically, your Honor,

15   is if what Mr. Hinnen was saying, was true, then the SCA would

16   govern not only a requirement that Google produced information

17   when served with the proper process, it would talk about, what

18   Google needs to do, how it needs to run its searches.

19       And if that was regulated by the statute, then I think

20   we might have a problem where -- where we could say, well,

21   maybe, the focus is -- maybe, Congress, you know, decided to

22   legislate around the methods used by a particular company to

23   retrieve data.  But that's not at all what Section 2703 says.

24       Section 2703, unlike, other sections of the Stored

25   Communications Act, unlike Section 2701 and 2702, it doesn't

1    refer to access, it doesn't talk about where data is accessed,

2    right, it only refers to disclosure. And I believe, Judge

3    Kabras (ph) in the -- in the dissent on the hearing, makes a

4    very compelling analysis as to why that furthers the position of

5    the Government that when you're looking at 2703, you're talking

6    about the disclosure, it couldn't really be any clearer from the

7    statutory text in 2702 alone. But even if you look at other

8    sections, in order to interpret the language there.

9         So, I think in terms of Morrison --

10        THE COURT: So --

11        MR. PAK: Yes.

12        THE COURT: -- so, this -- you'd kind of agree with --

13    I don't have to worry about search and seizure in the context of

14    the fact that Google is being compelled to retrieve and copy the

15    data responsive to the Government's warrant at the Government's

16    behest, right?

17        MR. PAK: No, no, I -- I think -- I mean, I agree -- I

18    mean, I agree with you, your Honor.

19        THE COURT: Okay.

20        MR. PAK: Yeah.

21        So, it's not a question -- this is not Google acting

22    as an agent for the Government, this is not Google, you know,

23    knocking down doors or this is not Google searching a Microsoft

24    user's account in Dublin, Ireland, right, in which case they

25    would be invading somebody else's possessory interests or

1  interfering with the possessory interests.  This is Google

2  accessing the data that it can access at all times for whatever

3  reason it seems -- it seems appropriate.

4         And if that was an invasion of privacy, then,

5  certainly, they'd be guilty of doing that all the time -- any

6  time they moved their subscribers' information around.  But

7  that's not -- that's not the issue, because everyone knows when

8  you create an account with Google, you provide the information,

9  they have custody and control of that.

10        And the SCA says, since you are the focal point, we're

11  focused on you, if the Government, you know, meets its certain

12  requirements as we set forth here, then you have to disclose,

13  that is the focus of the statute.  And again, that occurs here

14  in the United States.

15        Also, just on the issue of privacy and the balance

16  between privacy and law enforcement needs.

17        One thing -- one thing, that I think, Morrison makes

18  clear as well as RJR Nabisco, but the facts of Morrison make

19  incredibly clear, is that whatever might have motivated Congress

20  to create legislation, it doesn't matter for -- for an

21  extraterritorial -- an extraterritoriality analysis.  What

22  matters is the language that they ultimately enacted and to use,

23  maybe, an absurd example, your Honor, if Congress were to enact

24  a statute for purposes of saving the environment, they enacted a

25  statute that regulated the cutting down of trees.  The statutory

1    focus under Morrison would be cutting down trees, not saving the

2    environment.

3           The analog here is that, even if Congress wanted to

4    impose certain privacy protections on -- on third-party

5    information, that is analogous to saving the environment in my

6    example.  But the method that they used in the statute, the

7    analog to cutting down trees is regulating disclosure.

8           And Morrison treats the analysis this way and you can

9    tell from the facts of the case, because in the -- in the

10   opinion, the court declined to look at whether, you know --

11   whether the fraud occurred in the U.S., whether U.S. victims

12   were harmed, both arguably, what animated Congress to create the

13   legislation in the first place.

14          But it said, no, no, we have to look at specifically,

15   the method of operation of the statute by the text, which is the

16   two types of transactions that I described earlier.  And in the

17   same way, that is an analogous to the compelled disclosure.

18          So, everything that Google has said, everything that

19   Amaki (ph), has said with respect to privacy and the fact that

20   that might have been an animating force behind Congress in

21   creating the legislation, it is completely irrelevant under the

22   Morrison test, your Honor.

23          THE COURT:  Okay.

24          So, just to -- just to be clear, from your perspective

25   in terms of the analysis -- because some courts go with -- with

1  the language of search and seizure --

2         MR. PAK:  May --

3         THE COURT:  -- this is not -- this is just disclosure

4  -- compelled disclosure --

5         MR. PAK:  -- this is just compelled disclose --

6         THE COURT:  -- based on a warrant --

7         MR. PAK:  Right, right.

8         THE COURT:  -- not a search and seizure and whether

9  the search occurs overseas or in -- in the United States?

10         MR. PAK:  Right, right, I think -- I think, that's

11  right.

12         And I think, the only -- the only -- the only point in

13  time when -- when it makes sense to look at where a search and

14  seizure might occur would be if -- and this was Judge Rueter's

15  approach was that -- which was to say, Judge Rueter didn't

16  engage on whether the focus was disclosure or privacy, he

17  assumed, arguendo, that even if it were privacy as Google is

18  arguing or as the Microsoft court had found, that you still --

19  Google would still need to compel the production.

20         And if you'd go down that chain of the analysis, if

21  you were to say that, okay, I don't -- I don't think that

22  disclosure was the focus, which it clearly isn't in the text --

23  but -- but let's -- let's sort of take Microsoft head on and

24  say, even if we were to have assumed it was privacy, then the

25  question becomes, where does that invasion occur?  Then, it

1    would be relevant to think about where the invasion occurs.

2         I agree with Google that it's not, necessarily, a

3    matter of Fourth-Amendment doctrine.  I think Judge Rueter

4    looked at the Fourth-Amendment doctrine, because it's helpful to

5    understanding where the invasion occurs.  But you can think

6    about it from the terms of, listen, if Congress was trying to

7    protect privacy, then what would be the type of invasion of

8    privacy that Congress was worried about?

9         And that invasion isn't, arguably, the -- the

10   repatriation of data that Google already has control over, the

11   invasion of privacy is somebody in law enforcement looking

12   through all your e-mails, looking through your spam, looking

13   through your personal, you know, communications with folks and

14   determining whether that's evidence of a fraud in this case or

15   whatever type of case you may be dealing -- dealing with,

16   determining whether that's something that the Government can

17   then seize and use in a criminal investigation, that's the

18   invasion.

19        THE COURT:  And that happens long after there is

20   disclosure?

21        MR. PAK:  Long after there is disclosure.

22        THE COURT:  All right, okay.

23        MR. PAK:  Your Honor, and -- and I would even say,

24   even going a step back, if someone were to take a more -- a

25   slightly different approach -- the invasion would occur when

1   it's given to the Government and it's about to do that search.

2   But all of that occurs domestically.

3           THE COURT:  All right.

4           The -- I have two questions -- I don't know if you'd

5   have anything else to add on this argument, if you do please

6   make it now, because the other questions are going to take you

7   off a little --

8           MR. PAK:  Okay.

9           THE COURT:  -- a little bit of --

10          MR. PAK:  No, that's fine, your Honor.

11          THE COURT:  Okay.

12          Do you want me to ask the questions?

13          MR. PAK:  Yes, please, sorry.

14          THE COURT:  All right, yes.

15          So, in 2001, I think you noted, in 2001, that Congress

16   explicitly expanded the jurisdiction of the courts to issue

17   warrants for information located outside the district and I

18   think you mentioned earlier, a little bit about that.

19          But at that point in time, you will agree -- or do you

20   know -- whether Congress considered the extraterritorial litany

21   of issues at that time?

22          MR. PAK:  So, going back through the legislative

23   history, I -- I can't say, that Congress had, specifically,

24   engaged, debated on or discussed the question of whether the

25   data was overseas.  I think, the examples that we've seen in the

1  legislative history, typically, involved different districts as

2  opposed to a district and data overseas.

3          I will say that the -- the language, though, is clear

4  and the language doesn't, specifically, limit -- limit itself to

5  the United States.

6          Of course, that's -- you know -- we're not sort of

7  hanging our hat on that particular language, it's really just to

8  show that, first of all, Congress has revisited the statute.

9          Secondly, it has taken the statute away from the *In*

10 *Rem* type of territorial requirements that are associated with

11 traditional search warrants under Rule 41.

12         And also, you know, Google's counsel continuously

13 refers to the SCA as the sort of ancient legislation.  And your

14 Honor, it was -- I mean, it was enacted in 1986 --

15         THE COURT:  In '86, yeah.

16         MR. PAK:  -- '86, it's a little --

17         THE COURT:  But it's been amended a few times, right?

18         MR. PAK:  It's been amended in 2001 and '09.

19         THE COURT:  Now, regarding the amendment, the

20 Cybercrime Convention, what is the significance of that?

21         MR. PAK:  So, the significance is two fold.

22         So, one is that, you know, there is this question

23 about comity and -- and whether, you know, we're going to start

24 a war with another country, because we can authorize what the

25 SCA clearly authorizes.

1        So, first of all, fifty-two countries -- it was forty-

2   nine at the briefing stage -- but I believe there are fifty-two

3   signatories -- have signed a treaty that, basically says, each

4   country should have domestic legislation -- and it refers to it

5   as domestic legislation -- that does what the Government is

6   arguing, that the SCA already does.

7        Now, Congress when it was time to enact this -- to

8   ratify this and this would be the Senate -- in 2006, ratified

9   it, looked at Article 18(1)(a) and had to make the determination

10  as to whether it needed to create legislation to meet the

11  requirements of the treaty.  And it said, no, it didn't, the

12  current law takes care of that.

13       And that shows Congress's view as of 2006, which is,

14  you know -- you know, I -- Google's position is that -- you know

15  -- Congress enacted this in 1986, they didn't think about these

16  things.  Well, they did and the only -- and they thought about

17  it in their formal capacity as Congress.

18       Now, we cite a line of cases that granted, does not

19  specifically, involve treaty ratifications, but it involves

20  amendments.

21       And so, in 2006, Congress -- you know, the Senate --

22  decided an amendment wasn't necessary.  In 2009, Congress as a

23  whole revisits the SCA and also agrees that -- well, it also

24  doesn't amended, because it already does what the Budapest

25  Convention says, it needs to do.  And that is a very good

1   indicator as to what Congress's view of the statute is.

2       Now, we've cited a number of Supreme Court cases that

3   say, the courts can take this into consideration.  Google in its

4   reply cites a bunch of cases, that -- that predate all of the

5   cases that we've cited, that predate the first of the line of

6   the cases that we've cited, the <u>Red Lion Broadcasting</u> case --

7   that don't really apply.

8       And also are factually different, there are situations

9   where a member of Congress says, oh, I think the statute means

10  this or that.  And clearly, that's not the type of

11  interpretation that we're arguing for here.

12      THE COURT:  Very well.

13      At that time, when the convention was held, the

14  providers were complying, right, they were not raising up a -- a

15  stink as they're doing now and saying, you know, you can't get

16  the information, because it's -- it's outside the territory of

17  the United States?

18      MR. PAK:  The -- the stink has been raised for the

19  first time, your Honor as -- after the July decision of the

20  Second Circuit, up until now, this wasn't an issue.

21      Up until now, Google already had whatever code it

22  needed to have -- to pull all the data in and respond to search

23  warrants, right, this is an issue that's become live, because

24  Microsoft pushed it and got a decision at the Second Circuit

25  level.

1        And now, all of the providers -- as a result are --

2  are, essentially, unilaterally, applying the Second Circuit

3  decision in every other circuit.

4        THE COURT:  All right.  Very well.

5        That has it been applied -- I know that Judge Rueter

6  made a ruling on the warrant -- the two warrants in question

7  here and -- and disagreed with -- with their position.

8        And I think, there's another magistrate judge --

9        MR. PAK:  So --

10       THE COURT:  -- and he submitted supplemental

11  authority, but has any other district court judge ruled on this

12  or the Third Circuit Court?

13       MR. PAK:  Your Honor, you would be the first district

14  court judge to be dealing, specifically, with this issue.

15       The two other decisions out there, other than Judge

16  Rueter's decisions are the Eastern District of Wisconsin

17  decision.  As well as the Middle District of Florida decisions,

18  both at the magistrate level.  Both have agreed with the

19  Government and those -- that's the sum total of litigations --

20       THE COURT:  And it's not under appeal yet?

21       MR. PAK:  -- that a public -- no, no, no.

22       THE COURT:  Oh, okay.

23       What -- what is the standard, is this a *de novo* review

24  of what the judge -- Judge Rueter did?

25       MR. PAK:  I think, the standard would be, either,

1  clear error or -- or a mistake of law, so essentially, *de novo*,

2  that's -- in light -- in light of where we are.

3          And this is not a fact-specific scenario, it's just a

4  question of whether Judge Rueter was -- was incorrect in his

5  analysis -- in his legal analysis, so.

6          THE COURT:  Okay.

7          Anything else, that I -- that you wanted to argue to

8  me, that --

9          MR. PAK:  Yeah, yeah.

10          THE COURT:  -- that --

11          MR. PAK:  So, there's as few points that I wanted to

12  respond to, that were raised.

13          So, Google in its -- in it's argument here as well as

14  in its briefing, talked about Congress's use of the term,

15  warrant and how that has significance.

16          THE COURT:  Right.

17          MR. PAK:  So, keep in mind, what that essentially --

18  what the argument, essentially means.

19          So, the SCA provides for warrants, court orders and

20  subpoenas, all of that required --

21          THE COURT:  Right.

22          MR. PAK:  -- them to produce information.

23          The argument, essentially is, because it hinges on the

24  term, warrant, that Congress said, oh, well, there's going to be

25  a domestic limitation for this kind of data, but there's not

1   going to be one for -- for when we use the word, subpoena or

2   when we use the word, court order, which makes no sense, that we

3   would be able to get data, regardless of where it's sat from

4   Google, if we got it by a court order or a subpoena, but not

5   when we'd meet the gold standard of probable cause to get a

6   warrant, that's number one.

7           Number two, your Honor, is that the statute, itself,

8   actually, allows the Government to get contents by a subpoena or

9   a court order.

10          Now, there -- there's a Sixth Circuit case out there,

11  that says, if we did, that could possibly be a Fourth-Amendment

12  issue.  But that's a separate issue, that would be a Fourth-

13  Amendment issue for suppression by a criminal defendant.

14          Congress when it enacted the statute, thought that it

15  would be okay for the Government to proceed by subpoena or court

16  order, instead of a warrant to get the same type of information

17  that we're dealing here -- with here.

18          Now, what does that mean?  Is -- is there any

19  reasonable explanation as to why Congress would say, okay, well,

20  if you're proceeding under 18 USC, 2703 --

21          THE COURT:  With or without notice?

22          MR. PAK:  With notice, but we would be able to get --

23  seek delayed notice -- so --

24          THE COURT:  Okay.

25          MR. PAK:  -- sixty/ninety.

1          THE COURT:  Right, right -- to seek --

2          MR. PAK:  Yes.

3          But would there be a reason for Congress to say that,

4     you know, the Government can obtain this information by a

5     warrant, but only if it's domestic.  But I guess, the Government

6     could also obtain the same information by a subpoena or a court

7     order, regardless of where it sits.  That doesn't make sense,

8     because that's not what the term, warrant implies, it doesn't

9     apply it to any common person.

10          In fact, U.S. v. Boc, one of the cases they cite

11     refers to the probable-cause standard, as the warrant standard,

12     because that's obviously, what we think about when we talk about

13     warrants.

14          And this notion that it -- that Congress used that

15     term to protect privacy in a territorial way, it just doesn't --

16     it just doesn't really pan out under the law or under logic.

17          The -- Mr. Hinnen referenced blocking statutes, you

18     asked Google --

19          THE COURT:  Right.

20          MR. PAK:  -- right.

21          THE COURT:  But --

22          MR. PAK:  So, ah --

23          THE COURT:  -- I wanted to ask, because I think they

24     made a point which I didn't understand as to what is the

25     conflict with the foreign law or comity?

1      MR. PAK:  Right, right.

2      So, there are -- the sad -- the cases that he's

3 talking about, I believe, one or two of them are cited in our --

4 in our bit footnote in the *in personam* argument, your Honor.

5      But there are situations -- and it doesn't involve e-

6 mails and it doesn't involve the situation, like, what we're

7 dealing with here -- where defendants or parties or witnesses

8 had been compelled to disclose information and then, they cite

9 blocking statutes, like, there is Swedish law that says, I

10 cannot provide this information and it's -- it's in Sweden.

11      Even in those cases, your Honor, courts are entitled

12 to compel the production and it's also the -- the burden of the

13 party citing a particular blocking statute to bring it up and

14 establish that that is the law and that they've done everything

15 in their power to get around that law.

16      Now, we know from the convention that that's really

17 not an issue when we're dealing with Council of Europe countries

18 and countries that have signed on to that.

19      I can also tell you that Google has registered itself

20 under -- under the EU privacy shield, which actually allows them

21 to comply with information from lawful process here.

22      And again, as your Honor as already noted from the

23 briefs, there is nothing that -- that Google cites to,

24 specifically saying, that there is a violation of this law.

25      And let's look at this practically, your Honor.

1  Google doesn't know where the data is.  I mean, they know if

2  it's in the U.S., right.  But they don't know if it's in Dublin

3  or in New Zealand or wherever it may be and it moves around

4  quickly.

5      So, what kind of statute could Google cite to, when

6  their data moves around day to day and they don't even know, in

7  which country it -- it is.

8      THE COURT:  Right.

9      MR. PAK:  So, I mean, as a practical matter, it just

10  doesn't really make sense and it's -- you know, it's nice facial

11  argument to make, but as your Honor has noted, there's not

12  really a -- a concern about comity here, you know, that -- in

13  the way that's addressed in the briefing.

14     THE COURT:  Right.

15     If I accept their position, how would you get the

16  information?

17     MR. PAK:  Ah, I think, we wouldn't, your Honor.

18     (Laugher at 11:29 a.m.)

19     THE COURT:  You wouldn't, right.

20     MR. PAK:  I mean, that's -- I mean -- and obviously,

21  that's the issue, not only because of all of the issues that

22  were identified in your questioning of Mr. Hinnen at the

23  beginning of the argument, but also because the data moves

24  around so quickly, which is also part of the stipulations.

25     But as a practical matter, by the time we get -- seek

1    -- legal process and by the time we served it, even if it's on

2    Server A, it -- it can be on a different server, completely, in

3    a different country.

4            THE COURT:  Right.

5            You argue -- the argument that you've just made a few

6    minutes ago about, you know, the -- the -- we could get the

7    information by a court order or by a subpoena and the warrant

8    requirement, which would enforce the golden standards.

9            But my question to you is, under either scenario,

10   warrant, subpoena or court order, would the Morrison analysis

11   apply?

12           MR. PAK:  So, if you were to take -- let's -- let's

13   say, the Second Circuit decision, the panel decision was the law

14   of the land, if it was a Supreme Court decision and -- which is,

15   essentially, the same argument Google is making.

16           So, under Morrison -- I'm sorry -- under -- under the

17   Second Circuit's analysis, the extraterritoriality problem only

18   exists, because Congress used the term, warrant.  Congress also

19   used the term, subpoena in the SCA and so that problem wouldn't

20   exist in there -- it would exist with respect to subpoenas.

21           And, in fact, the Second --

22           THE COURT:  So, it doesn't apply, the analysis?

23           MR. PAK:  Yeah, it doesn't, even if you were going to

24   apply that, the -- the extraterritorial issue wouldn't -- the

25   extraterritoriality issue, it would not come up, if you were to

1  accept Google's argument and Microsoft's argument, it would not

2  come up outside the context of the warrant requirement in -- in

3  the SCA.

4          THE COURT:  Okay.

5          So, it would not apply to the warrant or -- the court

6  order -- the analysis would not apply to a subpoena or a court

7  order --

8          MR. PAK:  Right.

9          So, we would be able to --

10          THE COURT:  -- the -- the Morrison analysis.

11          MR. PAK:  -- under the Second Circuit opinion, the

12  Government would be able to get content -- ah --

13          THE COURT:  How about the Morrison test, would it

14  apply --

15          MR. PAK:  I'm sorry -- sorry.

16          THE COURT:  -- would the Morrison test apply to a

17  subpoena or a court order?

18          MR. PAK:  So, the Morrison test, ah, if it were to

19  apply, ah, you would not have a -- you would not -- right, so,

20  if we were to apply that test, you would not have an

21  extraterritoriality problem with respect to subpoenas or court

22  orders and I don't -- I'm not sure if that answers your

23  question.

24          THE COURT:  Why -- why not?

25          MR. PAK:  Well, first of all, because subpoenas -- for

1   the same reason, that we'd argue -- for the same reason that

2   we'd argue with respect to warrants, we're dealing with

3   disclosure and compelled disclosure in the context of subpoenas,

4   in the context warrants and in the contents of court -- in the

5   context of court orders.  And that disclosure occurs here in the

6   United States, number one.

7           Number two, the only reason this was raised in first

8   place, as potentially a problem, it was because the Second

9   Circuit's analysis which hinges on the use of term, warrant, so

10  where that term is not used, you wouldn't raise a Morrison

11  problem.

12          THE COURT:  All right.  Okay.  Anything else?

13          MR. PAK:  Ah, your Honor, I think, if you don't have

14  any questions for me, we would rely on our briefing outside of

15  what I've --

16          THE COURT:  No, I --

17          MR. PAK:  -- mentioned so far.

18          THE COURT:  -- I think -- I -- all the questions I had

19  for you.

20          I am going to give Counsel a few opportunities for

21  rebuttal and then, we'll conclude, we've been at it for a little

22  while.

23          MR. PAK:  Okay.  Thank you, your Honor.

24          THE COURT:  You're welcome.

25          (Pause at 11:32 a.m.)

1      MR. HINNEN:  Your Honor, mindful of the fact that

2  we've been at it for a little while, I'll try --

3      THE COURT:  Right.

4      MR. HINNEN:  -- to be as brief as possible here --

5      THE COURT:  I appreciate that, thank you.

6      MR. HINNEN:  -- I -- I would like to respond to a

7  couple of quick things.

8      The Government invokes the definitions in Section 2711

9  and the amendment to that definition, that Congress made after

10  the statute was enacted in 1986.

11     That certainly can be read either way and, in fact, it

12  might most naturally be read as -- as pregnant omission of -- of

13  the mention of a -- a warrant or any other legal process under

14  the SCA applying outside the United States.

15     Congress, specifically, amended the statute to say, it

16  can apply outside the district.  Congress, specifically, did not

17  amend the statute to say, it can apply outside the United States

18  or it applies to data stored outside the United States as well.

19     THE COURT:  Of course, at that time, we didn't have

20  the decision from the Second Circuit.

21     MR. HINNEN:  That's correct.

22     I think also relying on that definition confuses the

23  extraterritorial application of the statute with the

24  jurisdiction of the Court over -- over the individual or -- or

25  the crime under investigation.  So, I think, they are apples and

1    oranges -- oranges in that respect as well.

2         The provision of the Stored Communications Act that

3    compels a provider to assist the Government in obtaining

4    documents, it is not substantially different from the Assistance

5    provisions in the Wiretap Act and the Pen Register Trap and

6    Trace Act, all of which were passed as part of the original --

7    and one of which was amended, the Wiretap Act was amended.

8         The Pen Register Trap and Trace and the Stored

9    Communications Act were passed as part of an omnibus piece of

10    legislation called, the Electronic Communications Privacy Act,

11    so Congress viewed these things as a whole.  Those assistance

12    provisions are limited to the United States.

13         No one has ever suggested and no one would suggest,

14    that provider could be compelled to implement a wiretap out --

15    on its network infrastructure -- outside the United States or

16    that it could be compelled to implement a Pen Register Trap and

17    Trace on its infrastructure outside the United States,

18    regardless of where the person implementing the wiretap was

19    sitting.

20         I -- the Government's argument that all relevant

21    conduct occurs domestically, is like saying, your Honor, if you

22    ignore all the conduct that occurs overseas, all of it occurs

23    domestically.

24         It's true that if you'd take out the steps in the

25    process that occur overseas, that the -- that the statute

1   requires Google to take, that Google would never take, if it

2   didn't -- hadn't received the warrant compelling it to do so,

3   that everything else occurs inside the United States.

4           But that's not what the -- that's not what the -- what

5   the statute requires the Court to look at.

6           The Government said, if that conduct was -- was

7   regulated by the statute, that would be a different story, the

8   conduct is regulated by the statute.

9           If Google weren't required to take that conduct by the

10  statute, we wouldn't be here.  We would have complied with the

11  warrant completely, we've done everything we can inside the

12  United States to comply with the statute.

13          If the conduct that the Government is trying to compel

14  Google to undertake with the warrant, isn't regulate by the

15  statute, then that resolves the case and we -- and we can all go

16  home.

17          The Morrison test doesn't say, what word is used in

18  the statute, it says, what conduct is relevant to the focus of

19  the statute, it's a good deal broader in inquiry than the

20  Government would lead the Court to believe.

21          It really expressly -- it doesn't say, look just at

22  the focus and where the focus occurs, it says, look at where the

23  conduct relevant to the focus of the statute occurs and --

24          THE COURT:  Which is the -- which they argue is the

25  disclosure and the fact, that the warrant has been issued --

1          MR. HINNEN:  That's --

2          THE COURT:  -- right?

3          MR. HINNEN:  -- that's correct, that's what they are

4    -- that's what are --

5          THE COURT:  That's all they need?

6          MR. HINNEN:  It's not all they --

7          THE COURT:  That's the argument, right?

8          The rest is your problem of how you produce it?

9          MR. HINNEN:  It's -- it's not all they need, your

10   Honor, if we don't have to take any steps outside of the United

11   States, then we're done.  We've taken all the steps inside --

12         THE COURT:  No, you have to step -- you have to take

13   steps to comply, whatever those steps may be to -- to -- that

14   are responsive to the -- to the warrant.

15         MR. HINNEN:  I agree and those steps are relevant

16   to --

17         THE COURT:  Okay.

18         MR. PAK:  -- relevant to the focus of the statute,

19   that's correct.

20         THE COURT:  Right.

21         MR. HINNEN:  Ah, the Government argues that whatever

22   might have motivated Congress doesn't matter, that's contrary,

23   your Honor, to centuries of statutory interpretation.  It is, in

24   fact, the intent of Congress that is the lynchpin and the

25   touchstone of statutory interpretation.  So, I am not sure what

1    the Government means when it says that.

2         The fact -- the Government also emphasized, you know,

3    it was only thirty-one years ago, that the statute was passed,

4    there have been some minor amendments since then.

5         The Internet didn't even exist thirty-one years ago

6    when the statute was passed, Google didn't exist, many of the

7    companies that are impacted by this, didn't exist.  In the

8    lifetime of Internet, that thirty-one years is more than the

9    whole lifetime of the Internet.

10        So, it's -- as we say in our briefing -- in the

11   lifetime of the Internet, that thirty-one years is an epic.

12        I think, our briefing addressing the Sealy Cybercrime

13   Convention issue, effectively.  There is no -- there is no case

14   that says, that the Senate exercising its advice and consent

15   authority can step in to the shoes of Congress as a whole and

16   express the -- the intent of the entire body, it's a -- it's a

17   completely different function, it even -- it exists in a

18   different Article of the Constitution.

19        I -- I guess, the last thing to clarify, the -- your

20   Honor, is that Google has not and is not interposing a blocking-

21   statute objection to the warrant in this case.  That issue came

22   up only as a result of -- of the question of whether there was

23   any potential conflict with -- with foreign law or whether there

24   was any potential comity issue.

25             And the passage of those blocking statutes, very

1  clearly indicates that foreign governments are interested in

2  this issue, that they're interested in how U.S. law can compel,

3  the production of documents stored in their jurisdictions.

4        In the <u>Microsoft</u> case, the government of Ireland

5  participated as an -- and an *amicus.*  And it objected to the

6  application of U.S. law to data stored within Ireland.

7        There just is no question as a factual matter, that

8  foreign governments care deeply about this issue and that

9  resolving this issues has ramifications for diplomacy, for

10 comity and for international trade.

11       THE COURT:  Okay.

12       MR. HINNEN:  Thank you, your Honor.

13       THE COURT:  Well, thank you very much for your

14 arguments.  I will take it under advisement and I will issue an

15 order in due course.  Thank you.

16       MR. PAK:  Thank you, your Honor.

17       MR. HINNEN:  Thank you, your Honor.

18       ESR OPERATOR:  All rise.

19       (Adjourned in this matter at 11:39 a.m.)

20                              *  *  *

21

22

23

24

25

C E R T I F I C A T E

    I do hereby certify that the foregoing is a correct transcript of the electronic-sound recording of the proceeding in the above-entitled matter.


_____         Date: <u>April 24, 2017</u>
Gail Drummond
28 8th Avenue
Haddon Heights, New Jersey  08035
(856) 546-6270